## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RAYNOR D. FOX,                    CASE NO. 4:21-cv-12950

     *Plaintiff*,            HON. MATTHEW F. LEITMAN
*v.*                         DISTRICT JUDGE

A. JENKINS,                 HON. PATRICIA T. MORRIS
JOHN DOES,               MAGISTRATE JUDGE
and JANE DOES,

     *Defendants*.
_____/

## REPORT AND RECOMMENDATION TO DENY DEFENDANT JENKINS' MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF EXHAUSTION (ECF No. 20)

### I.    RECOMMENDATION

For the following reasons, **I RECOMMEND** that the Court **DENY** Defendant PC Amie Jenkins' July 27, 2022 Motion for Summary Judgment on the Basis of Exhaustion. (ECF No. 20).

### II.    REPORT

#### A. Introduction

This is a prisoner civil rights case brought under 42 U.S.C. § 1983. On December 10, 2021, Plaintiff filed a complaint in this Court, alleging Eighth Amendment violations arising from Defendant Jenkins' repeated refusal to provide

1

him with clean socks over the course of his 18-day placement in quarantine.  (ECF No. 1, PageID.20-21).

## 1. The Complaint

Plaintiff, housed at Michigan Department of Corrections ("MDOC") Thumb Correctional Facility ("TCF"), currently and during the relevant period, makes the following allegations.

On September 3, 2020, Plaintiff was ordered to pack his property in a duffel bag.  (*Id*. at PageID.20).  But soon after, he was told to "leave everything" and was escorted (with nothing more than the clothes he was wearing) to an isolation room due to close contact with an individual testing positive for COVID-19.  (*Id*.)  The next day, he asked prison counselor ("PC") Jenkins to contact the TCF's Quartermaster to provide him with three changes of underclothing, including three pairs of socks.  (*Id*.)  Jenkins refused but instead gave him "a vague response" about his property being brought to him.  (*Id*.)  On September 8, Plaintiff received a few of his own clothing items but did not receive socks.  (*Id*.)  Two days later, he asked Jenkins about socks, to which she replied that Plaintiff ought to have told her earlier and then blamed another staff member for Plaintiff being forced to wear the same pair of socks every day for an entire week.  (*Id*.)  On September 14, she spoke with other inmates housed in the quarantine unit but did not inquire as to whether Plaintiff had received socks.  (*Id*.)  On September 15, Plaintiff again asked Jenkins about the

socks, to which she responded that "'the quartermaster has no socks.'" (*Id*. at PageID.20-21).  She also refused to bring Plaintiff his own socks. (*Id*. at PageID.21).

On September 21, 2022 (the 19th day since he had changed his socks) he was returned to his regular unit. (*Id*.)  The same day, he experienced foot pain and noticed an open wound on his left foot. (*Id*.).  He showed PC Oosterhof his left foot, which was "inflamed," with "raw, itchy, abscessed sores." (*Id*.)  Later the same day, after two other staff members had examined the foot, Plaintiff was taken to Health Care, where a nurse told him he "may [have] a fungal infection." (*Id*.)

## 2.  The Grievance

Plaintiff's Step I two-page, typewritten grievance, dated September 25, 2020, states that the incident(s) in question occurred between September 3 and 21, 2022. (ECF No. 20-3, PageID.109).  Although Plaintiff included a date of September 25 on the form, the grievance is date-stamped "received" September 30, 2020. (*Id*.)  In the grievance, Plaintiff sets forth allegations against Jenkins identical to those in the Complaint. (*Id*. at PageID.111).

The Step I grievance was rejected as untimely on September 30, 2020.  O. Carter, Assistant Deputy Warden of TCF, signed the rejection on October 2.  He stated that under MDOC Policy Directive ("P.D.") 03.02.130, ¶ Q:

> [P]rior to submitting a written grievance, the grievance shall attempt to resolve the issue within 2 business days. . . . The Step I grievance must be filed within 5 business days after the attempt to resolve.  You state the incident took place on multiple dates beginning 9/3/20.  This

grievance was written on 9/25/20 and not received in this office until 9/30/20 which makes the grievance untimely.

(ECF No. 20-3, PageID.110).  On October 8, 2020, Plaintiff composed a kite requesting a Step II grievance form.  (ECF No. 1, PageID.26).  He states that he submitted his Step I grievance on September 25, 2020 by interdepartmental "ID" mail on September 25, 2020 but "how it did not get to your office till 3 days later is a mystery to me but I am going further [with the grievance process] all the same." (*Id*. at PageID.26).  He completed a Step II grievance on October 15, 2020.  (*Id.* at PageID.17).  On October 16, 2020, he was notified that his Step II grievance was being returned because he had not provided a copy of his Step One grievance and response to the grievance.  (ECF No. 20-3, PageID.108).  He was directed to resubmit the grievance along with copies of the Step I grievance and response.  (*Id.*)

## B.    Summary Judgment Standard

A court will grant a party's motion for summary judgment when the movant shows that "no genuine dispute as to any material fact" exists. Fed. R. Civ. P. 56(a). In reviewing the motion, the court must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.

4

1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper when the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot merely rest on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the non-moving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493. And while a pro se party's arguments are entitled to liberal construction, "this liberal standard does not ... 'relieve [the party] of his duty to meet the requirements necessary to defeat a motion

5

for summary judgment.'" *Veloz v. New York*, 339 F. Supp. 2d 505, 513 (S.D.N.Y. 2004) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

### C. Exhaustion Under the PLRA

Under the Prison Litigation Reform Act ("PLRA") of 1996, specifically 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The exhaustion requirement is mandatory and applies to all suits regarding prison conditions, regardless of the nature of the wrong or the type of relief sought. *Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731, 741 (2001). Furthermore, "exhaustion" under the PLRA means "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 92 (2006). In *Woodford*, the Supreme Court defined "proper exhaustion" as requiring "compliance with an agency's deadlines and other critical procedural rules...." *Id.* at 90.

MDOC Policy Directive ("P.D.") 03.02.130, effective March 18, 2019, prescribes the three-step administrative exhaustion process for grievable matters. At

Step I, a prisoner must "attempt to resolve the issue with the staff member involved within two business days" and, if unsuccessful, must file a grievance within five business days. *Id.* at ¶ Q. "Grievances and grievance appeals at all steps shall be considered filed on the date received by the Department." *Id.* at ¶ T.  If the inmate is dissatisfied with the disposition of the grievance, or does not receive a response ten days after the due date, he or she may file a Step II grievance using the appropriate form. *Id.* at ¶ DD.  Similarly, if the inmate is dissatisfied with the Step II response or does not receive a response for ten days after the response was due, he or she may file a Step III grievance. *Id.* at ¶ HH.

To be properly exhausted, a defendant must be named at Step I. P.D. 03.02.130, ¶ S provides:

> The issues should be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places, and names of all those involved in the issue being grieved are to be included.

(underscore in original).

### D.  Analysis

Jenkins argues that Plaintiff's failure to comply MDOC's grievance procedures before filing suit mandates dismissal of the claims against her.  (ECF No. 20, PageID.88).  She contends that Plaintiff's Step I grievance, time-stamped as received on September 30, 2020, was properly rejected as untimely because it was

based on incidents beginning on September 3 and ending on September 21, 2020. (*Id.*)   She argues that Plaintiff also failed to comply with MDOC's grievance procedures by failing to include a copy of the Step I grievance and response along with his Step II grievance.

Plaintiff disputes that he was non-compliant with the grievance procedure. (ECF No. 24, PageID.141-149).  He argues first that although the grievance was not stamped as "received" until September 30, 2022, he mailed the grievance on September 25, 2022 by ID mail.  (*Id.* at PageID.147).  He states that he does not know why it took five days for the grievance to be received but that the "mailbox rule" and MDOC P.D. 05.03.118 (March 1, 2018) both apply and that the grievance ought to have been deemed "received" on the day of mailing.  (*Id.*)

Plaintiff also disputes that his failure to compose and send a grievance until September 25 for incidents beginning on September 3 was otherwise untimely.  He points out that he was not seen by a doctor until September 24, at which time he was diagnosed with a foot fungus.  (*Id.*)  He argues, in effect, that the doctor's examination and diagnosis of foot fungus (demonstrating injury resulting from Jenkins' nonfeasance) triggered the five-day window for filing a written grievance under P.D. 03.02.130, ¶ Q.

Plaintiff also disputes that his failure to include the Step I response with his Step II grievance places him in non-compliance with the grievance procedures.  He

8

notes that he never received a response to his Step II grievance and at one point, was falsely accused of having not filed a Step II grievance at all. (ECF No. 1, PageID.17).

### 1.  Timeliness:  The Mailbox Rule and P.D 05.03.118

The Step I grievance appears to have been rejected as untimely on two bases: First, as discussed here, the grievance was not received until September 30, over five days after the last incident described in the grievance, a nurse's September 21 diagnosis of a probable fungal infection. (ECF No. 20-3, PageID.112).

Plaintiff's claim that his grievance ought to have been deemed "filed" when he placed it in ID mail is based on his understanding of the "mailbox rule," where "a pro se prisoner's pleading is deemed filed when it is handed over to prison officials for mailing to the court." *Williams v. Cheeks*, No. 21-11569, 2022 WL 4343070, at *1 (E.D. Mich. Sept. 19, 2022) (citing *Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008)).  "Cases expand the understanding of this handing-over rule with an assumption that, absent contrary evidence, a prisoner does so on the date he or she signed the complaint." *Brand*, 526 F.3d at 925.

A Plaintiff's use of ID mail to send his grievance is permitted under P.D. 05.03.118, ¶ Q.  "Prisoners may use . . . interdepartmental mail runs, in facilities where such service is available, to send postage-free mail to staff in other facilities serviced by interdepartmental mail runs and to Central Office." *Id.*  Plaintiff has provided a notarized affidavit stating that on September 25, 2020, he placed the Step

I grievance in a mailbox for ID mail while residing in the Auburn unit of TCF.  (ECF No. 24, PageID.159).

Jenkins relies on P.D. 03.02.130, ¶ Q, which states that a Step I grievance must be filed "within five business days after the grievant attempted to resolve the issue with appropriate staff," and that under paragraph T of the same directive, "grievances . . . shall be considered filed on the date *received* by the Department." (ECF No. 20, PageID.86) (emphasis added).[1]

The MDOC's policy directive regarding the filing of grievances does not include an actual "mailbox rule" that grievances are deemed filed on the day they are sent by ID mail.   Nonetheless, another portion of policy directive provides support for Plaintiff's mailbox rule argument.   P.D. 03.02.130, ¶ W states that "Within five business days after attempting to resolve a grievable issue with staff, a grievant wishing to advance a grievance must *send* a completed [grievance form] … to the Step I Grievance Coordinator . . ."  (Emphasis added).

In terms of when a prisoner's grievance is filed for purposes of an exhaustion analysis, ¶ W controls, and it does not conflict with ¶¶ Q and T. Specifically, ¶ T requires that grievances be date-stamped at the time of receipt, and states that "[t]ime frames for *responding* to grievances are set forth in this policy directive." (Emphasis

---

[1] While Jenkins' motion does not state that the grievance was untimely pursuant to paragraph Q, the Step I grievance rejection itself states that the grievance did not conform with P.D. 03.02.130, ¶ Q.  (ECF No. 20-3, PageID.110).

added). Paragraph Z then provides that a "Step I grievance shall be *responded to* within 15 business days after receipt of the grievance unless an extension is granted pursuant to Paragraph T." (Emphasis added). The import of the date of receipt under ¶¶ Q and T is that it triggers the time for the institution to respond to a grievance. Because interdepartmental mail is not instantaneous, to measure the MDOC's response time from the *mailing* of a grievance would both shorten the response time and most likely lead to inconsistent response times for grievances that arrive at disparate times after mailing.

On the other hand, ¶ W, written in the active voice, directs a prisoner to *send* a grievance form within five business days. This places a consistent and understandable duty on the prisoner. But to measure the five-day period from the date of *receipt* would be to subject the prisoner to the vagaries of the prison mail system, which are totally beyond the prisoner's control. A prisoner should not be penalized for the delays in ID mail.  "Although the PLRA mandates exhaustion of administrative remedies, the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies." *Bennett v. Winn*, No. 17-CV-12249, 2018 WL 4784669, at *5 (E.D. Mich. June 6, 2018), *report and recommendation adopted in relevant part,* No. 17-CV-12249, 2018 WL 3853601 (E.D. Mich. Aug. 14, 2018) (quoting *Ross v. Blake*, 578 U.S. 632, 642 (2016). "Accordingly, an inmate is required to

exhaust only those grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.*

In short, ¶ W gives the prisoner a clear five-day period from his or her attempt to resolve an issue to *send* a grievance, while ¶¶ Q and T give the institution 15 days from receipt to *respond* to the grievance. Viewing the Policy Directives as a whole, both the institution and the prisoner are given clear and consistent time frames within which to act, and do not subject them to conditions beyond their control.

Plaintiff has provided a sworn statement that he sent the Step I grievance by ID mail just one day after a doctor's September 24, 2020 diagnosis of a potentially serious medical condition resulting from Jenkins' failure to provide him with clean socks. (ECF No. 24, PageID.147, 159). If Step I grievances sent by ID mail are regularly in transit for five days before being "received," the inmate no longer has a five-day window after failing to resolve a dispute but rather, an impossible "zero-day" window to avoid a rejection of the grievance on the basis of untimeliness. "[T]he Sixth Circuit has 'excused a prisoner's lack of complete compliance when the improper actions of prison officials render the administrative remedies functionally unavailable.'" *Stenberg v. Corizon Health, Inc.,* No. 20-CV-10674, 2022 WL 206171, at *7 (E.D. Mich. Jan. 21, 2022), *on reconsideration in part sub nom.* No. 20-CV-10674, 2022 WL 3204517 (E.D. Mich. Aug. 8, 2022) (citing *Himmelreich v. Federal Bureau of Prisons*, 766 F.3d 576, 577 (6th Cir. 2014)). In

*Stenberg*, the court found a question as to whether the plaintiff-inmate's administrative remedies were "available" where although he filed a grievance the same day he received a grievance form from prison staff, the grievance was nonetheless denied as untimely. *Id.* ("Prior to discovery, and on this limited record, the Court is not persuaded that as a matter of law, the grievance process was available to Stenberg.").  In this case, Plaintiff's sworn affidavit supports a finding that he filed his grievance timely under ¶ W.  But even apart from this, a question of fact would remain as to whether Plaintiff's ability to file a "timely" grievance was thwarted by matters outside his control.

## 2.  Timeliness:  Events Beginning on September 3, 2020

The second basis for rejection for untimeliness appears to be that grievance (time-stamped September 30) post-dated the September 3 placement in quarantine by several weeks – even assuming that the Step I grievance was deemed "received" on September 25.  (ECF No. 20-3, PageID.110) ("You state the incident took place on multiple dates beginning 9/3/20. This grievance was written on 9/25/20 and not received in this office until 9/20/20 which makes the grievance untimely.").

However, the rejection on the basis that the grievable events began on September 3 reflects a misreading of Plaintiff's Step One submission.  The grievance does not allege that Jenkins' nonfeasance began on September 3.  Instead, Plaintiff begins his narrative from that date (the day he was sent to the quarantine unit) and

continues until the nurse's September 21 diagnosis. (ECF No. 20-3, PageID.111-12). The neatly typed grievance states that on September 4, Jenkins told him that his property would be brought to him and on September 9, Jenkins and another staff member brought him his own clothing minus a change of socks. (*Id*. at PageID.111). Jenkins' alleged nonfeasance appears to have begun on September 10 when Plaintiff reminded her that he had been wearing the same pair of socks for a week, in response to which Jenkins blamed another staff member instead of getting him socks. (*Id*.) The grievance states that he asked Jenkins for socks as late as September 15 but that she "refused" to ask someone from the Auburn unit to brings him his socks. (*Id*. at PageID.111).

Plaintiff also states in response to the present motion that during the quarantine he asked Jenkins "almost daily" for socks. (ECF No. 24, PageID.147). He states that he "kited" Jenkins twice during his time in quarantine, presumably with the expectation that he could resolve the sock issue informally. (*Id.* at PageID.146).

To be sure, the rejected grievance itself does not allege that he asked Jenkins for socks after September 15 or mention that Plaintiff kited Jenkins twice before leaving the quarantine unit. The September 25 grievance mailing (by Plaintiff's account) is still 10 days after the September 15 encounter, which with nothing more

14

would make September 25 mailing untimely.[2]  However, the grievance allegations do not end with the September 15 exchange.  The grievance states that Plaintiff was not aware of the full consequences of Jenkins' alleged nonfeasance until September 21, when his foot became painful, he noticed an abscess, and he was given a preliminary diagnosis of foot fungus.  (ECF No. 20-3, PageID.112).  Because the Plaintiff filed the grievance within five days of the "ongoing" consequences of Jenkins' inaction, the grievance was timely. The Court in *Freeman v. Holmes*, No. 1:19-CV-728, 2020 WL 4194483, at *6 (W.D. Mich. June 24, 2020), addressed a similar situation:

> [W]hile the time for filing a grievance for an acute medical condition, such as a heart attack, can be readily ascertained, "[t]he seriousness of a chronic condition may not become obvious to prison officials until some time passes, and the indifference to that condition—and the resulting pain suffered by the prisoner that equates to the infliction of punishment—may not become manifest until then as well." *Id.* at 783. The court said that such a condition is "properly identified as 'ongoing,' and a grievance that identifies the persistent failure to address that condition must be considered timely as long as the prison officials retain the power to do something about it." *Id.* at 783–84. Here, [Freeman's] lack of proper shoes to ensure that he did not develop pressure ulcers and infection was an ongoing issue at the time [he] filed his grievance.

_____

[2]Plaintiff also states in response to the present motion did not learn until his arrival back at the Auburn unit on September 21 that it was within Jenkins' ability to ask that his socks be brought to him during his time in quarantine.  PC Oosterhof, upon discovering that Plaintiff had worn the same socks for 18 days, told him that "[i]f anyone would have called me [from the quarantine unit] I would have brought them to you myself." (ECF No. 24, PageID.145).

*Id.* (quoting *Ellis v. Vadlamudi*, 568 F. Supp. 2d 778, 783-784 (E.D. Mich. 2008)), *report and recommendation adopted,* No. 1:19-CV-728, 2020 WL 4192564 (W.D. Mich. July 21, 2020).

So, although the grievance itself does not state that Plaintiff asked Jenkins for socks every other day up until September 21 or mention the written kites or the doctor's September 24 diagnosis of a fungal infection, it *does* state that Plaintiff did not became aware of the medical/health consequences of Jenkins' nonfeasance until September 21. (ECF No. 20-3, PageID.112). In other words, the lack of clean socks due to Jenkins' nonfeasance was no longer a mere nuisance or inconvenience but resulted in a diagnosable medical condition. And as of the time he left quarantine on September 21, Jenkins still had not obtained socks for Plaintiff, so both her inaction and the consequences of her inaction were ongoing.

The September 25 grievance is also consistent with the requirements of P.D. 03.02.130, ¶ Q: "Prior to submitting a written grievance, the grievant shall attempt to resolve the issue with the staff member involved within two business days *after becoming aware of* a grievable issue, unless prevented by circumstances beyond his/her control . . ." The grievance states that Plaintiff first became "aware" of the infection on September 21. Because he left the quarantine unit earlier that day, he was not able to continue his efforts to resolve the issue with Jenkins before filing a

grievance.  Accordingly, Jenkins has failed to establish as a matter of law that the September 25 grievance was untimely.[3]

### 3.  Failure to Include Step I Grievance and Response with Step II Grievance

In a one-sentence argument, Jenkin contends that Plaintiff's Step II grievance was properly rejected because it did not include a copy of the Step I grievance and rejection.  (ECF No. 20, PageID.86, 88).  In an equally terse response, Plaintiff states that he submitted the Step II grievance as quickly as possible "to advance the issue and to avoid" a second finding that his grievance was untimely.  (ECF No. 24, PageID.147).

Under P.D. 03.02.130, ¶ Z, "[a] Step I grievance shall be responded to within 15 business days after receipt of the grievance unless is an extension is granted . . ." Under ¶ DD of the same directive, an inmate filing a Step II grievance must "send the completed form to the Step II Grievance Coordinator designated for the facility, field office, or other office being grieved within ten business days after receiving the Step I response or, if no response was received, within ten business days after the date the response was due, including any extensions."

_____

[3] Because Plaintiff had been returned to his regular unit at the time he discovered the fungal infection, he was prevented from resolving the issue informally with Jenkins, who was assigned to the quarantine unit, by "circumstances beyond his control." P.D. 03.02.130, ¶ Q.

Plaintiff's October 15, 2020 Step II grievance states that his concerns were "not resolved at Step I, as such" he was "appealing and continue on." (ECF No. 20-3, PageID.107).  On October 16, 2020, Plaintiff was told in writing to "attach and resubmit" the Step II grievance accompanied by a copy of the Step I grievance and response.  (*Id*. at PageID.108).  The form provided to inmates for making Step II grievances states that the Step I Grievance and response (if a response was made) "**MUST** be attached" to the Step II grievance.  (*Id*. at PageID.107) (emphasis in original).

Jenkins' one-sentence argument and exhibits do not establish that Plaintiff failed to exhaust his administrative remedies.  First, MDOC's policy directive does not require that a Step II grievance must include the Step I grievance or grievance response.  At least one other court in this district has rejected the argument that the complying with the requirements set forth on the Step II grievance form (but not included in the policy directive) is necessary for the exhaustion of administrative remedies:

> The MDOC Policy Directive only requires prisoners to fill out and file a Step II appeal form after not receiving a Step I response. 03.02.130, ¶ BB. It does not require prisoners to include additional documents, such as the golden rod copy [of the Step I grievance], that must be attached to the form itself. In fact, ¶ H of the policy bars MDOC personnel from denying a grievance solely because it does not have specific documents attached. *Id.* The only mention of a golden rod copy is on the Step II grievance form itself; there is no such requirement in the MDOC Policy Directive. Under MDOC Policy Directive 03.02.130, ¶ H, a "completed" Step II appeal form is not

required        to        include        such        a        document.

*Colen v. Corizon Med. Servs.*, No. CV 14-12948, 2017 WL 8683318, at *7 (E.D.

Mich. Aug. 15, 2017) (Question of fact remains as to whether the inmate had

sufficiently exhausted his claims.).[4]  Jenkins' claim that the Step II grievance was

permissibly rejected because it was not accompanied the Step I grievance and

rejection is contradicted by P.D. 03.02.130, ¶ H.

Second, the exhibits do not include an actual Step II response or "rejection."

The notice of correction states that the grievance should be resubmitted with a copy

of the Step I grievance and response.  (*Id*.)  But Jenkins provides no evidence that

Step II grievance was ultimately rejected because it did not include a copy of the

Step I response.  Again, as noted in *Colen* and the current policy directive, grievances

"shall not be rejected or denied solely because the prisoner has not included with

his/her grievance exhibits or other documents related to the grievance . . ." P.D.

03.02.130, ¶ H.  Rejecting the Step Two grievance on this basis alone would be

improper.

Finally, the Step III response by the MDOC states that the Step II was

"upheld" and that the Step III appeal was rejected. (*Id*.)  While Jenkins' present

argument is based wholly on Plaintiff's allegedly non-compliant Step II grievance,

---

[4] While *Colen* relies on a superseded version of MDOC's policy directive, the
portions cited are also in the current version.  *See* P.D. 03.02.130 (March 18,
2019), ¶ ¶ H, DD.

she does not include a Step II rejection of the grievance on that basis. As set forth in the policy directive, the failure to include the related documents is not a basis for rejecting or denying the grievance. It is unclear whether the Step III rejection was based on (1) the failure to provide a copy of the Step I grievance and response at Step II (an improper basis for rejecting a grievance); (2) the erroneous Step I determination that the original grievance was "untimely;" or (3) a third, unknown reason.[5]

### E. Conclusion

Because there are disputed questions of fact as to whether Plaintiff properly exhausted his administrative remedies, **I RECOMMEND** that the Court **DENY** Defendant PC Amie Jenkins' July 27, 2022 Motion for Summary Judgment on the Basis of Exhaustion. (ECF No. 20).

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and

---

[5] Plaintiff alleges that his attempts at follow-up communication with the individuals processing his Step II and III grievances were non-productive. (ECF No. x, PageID.17). He states that he was accused of not filing a Step II grievance altogether by both Step II and Step III coordinators. (*Id*. at PageID.17-18). Yet, the MDOC Prison Step III Grievance Report appended to Jenkins' motion contains a copy of the Step II grievance. (ECF No. 20-3, PageID.107).

recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: November 14, 2022                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge