## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RANOR D. FOX,[1]

CASE NO. 4:21-cv-12950

               *Plaintiff*,

Matthew F. Leitman
United States District Judge

*v.*

AMIE JENKINS, et al.,

Patricia T. Morris
United States Magistrate Judge

               *Defendants*.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS JENKINS, BUHL, AND CARTER'S MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 39, 41) AND PLAINTIFF'S MOTION FOR RESPONSE TO DISCOVERY (ECF No. 47)

### I.    RECOMMENDATION

For the following reasons, **I RECOMMEND** that the Court **GRANT** Defendants Jenkins, Buhl, and Carter's motions for summary judgement (ECF Nos. 39, 41) and dismiss Fox's complaint. I also **RECOMMEND** that the Court **DENY** Fox's discovery motion (ECF No. 47).

### II.   REPORT

#### A.    Background

Raynor Fox is a prisoner in the custody of the Michigan Department of Corrections ("MDOC") who alleges that a prison official, Amie Jenkins, violated his

---

[1] Although misspelled in the docket, the Undersigned recognizes that Fox's first name is correctly spelled as "Raynor."

Eighth Amendment rights by failing to provide him a pair of clean socks during an eighteen-day quarantine. (ECF No. 1, PageID.4, 17–18).

In September 2020, prison officials informed Fox that he would be transferred from his normal housing unit, "Auburn-A," to "Franklin-B," a quarantine unit, because he came in "close contact" with an individual who tested positive for COVID-19. (ECF No. 20-3, PageID.111; ECF No. 41-2, PageID.367). After allowing Fox less than five minutes to pack his belongings, officials escorted Fox to Franklin-B with "nothing but the clothes [he] was wearing" and a plastic bag filled with toiletries such as soap, towels, washcloths, and a toothbrush. (ECF No. 41-2, PageID.380–81).

The next day—the Friday before Labor Day weekend—Fox asked the "prison counselor" for Franklin-B, Amie Jenkins, to request shorts, shirts, "[three] pair[s] of socks," and underwear from the "quartermaster." (ECF No. 20-3, PageID.111; ECF No. 41-5, PageID.409–10, ¶ 2). The "quartermaster" is the official "in charge of" supplying state-issued clothing for the prison population. (ECF No. 41-2, PageID.369–70). Jenkins responded that it would not be necessary for her to do so as she expected his "property" to be "brought to" him. (ECF No. 20-3, PageID.111).

Fox next spoke to Jenkins on the Tuesday following Labor-Day weekend. (*Id.*) After Fox asked Jenkins when he would receive his clothing, Jenkins replied, "they didn't bring you any over yet?" (*Id.*) She then told Fox that he would remain

2

in quarantine for "a while," and gave him a form to request additional state-issued clothing from the quartermaster.  (*Id.*; *see also* ECF No. 41-5, PageID.410, ¶ 5–6). Before handing the form over to Fox, Jenkins signed it and noted that Fox had been transferred to Franklin-B without a change of clothes.  (ECF No. 41-5, PageID.410, ¶ 6; *see also* ECF No. 41-4, PageID.407).   Fox then completed the form and delivered it to a corrections officer to submit on his behalf.  (ECF No. 20-3, PageID.111).  The quartermaster processed the form the next day and denied Fox's request because he did not have the requested items in stock.  (ECF No. 41-4, PageID.407; *see also* ECF No. 41-5, PageID.407).

That same day, Jenkins and Counselor Oosterhoff, the prison counselor for Auburn-A, arrived at Fox's cell with a bag of Fox's clothing.  (ECF No. 20-3, PageID.111; ECF No. 41-2, PageID.374–77).   Although the bag contained underwear, shirts, and shorts, it did not contain any socks.  According to Fox, that was because Oosterhoff only brought over his state-issued clothing, leaving his "personal" clothing items—clothing Fox had purchased using his own funds— behind.  (ECF No. 41-2, PageID.374–77).  But Fox had recently thrown away all of his state issued socks and only had "personal" when he was quarantined.  (*Id.*)  So because Oosterhoff did not bring any of Fox's personal items to Franklin-B, he did not bring Fox an extra pair of socks.  (*Id.*)

The following day, Fox informed Jenkins that he did not receive any socks in the bag she and Oosterhoff had dropped off the day prior. (ECF No. 20-3, PageID.111). Jenkins emailed the quartermaster to request a pair of socks, but the quartermaster responded that the prison did not "have any socks." (ECF No. 41-5, PageID.410, ¶ 8; ECF No. 41-6, PageID.414). Jenkins's email mentions that she also reached out to an individual named "[Sergeant] Fowler" for help obtaining a pair of socks. (ECF No. 41-6, PageID.414).

Fox continued to ask Jenkins for socks over the next several days, and "almost every time" he would remind her that she could retrieve his personal socks from Auburn-A by calling Oosterhoff. (ECF No. 41-2, PageID.374–75, 392). But each time, Jenkins would ignore Fox's request for her to contact Oosterhoff and claim that she could not obtain any socks for him because the quartermaster had no socks available. (*Id.*; *see* ECF No. 20-3, PageID.111). Although Jenkins maintains that she had "no authority to purchase socks" on behalf of inmates, she does not explain why she did not ask Oosterhoff or any other official in Auburn-A to bring Fox's personal socks to Franklin-B. (ECF No. 41-5, PageID.410, ¶ 4).

Officials eventually released Fox from quarantine on September 21, eighteen days after his transfer to Franklin-B. (ECF No. 20-3, PageID.112; ECF No. 41-2, PageID.373). Fox continued to wear his socks throughout this entire period, and after returning to Auburn-A, he noticed a "pustule" the size of his "thumbnail" on

the arch of his foot. (ECF No. 41-2, PageID.373, 381–82, 386). Healthcare officials later diagnosed the pustule as a fungal infection and provided Fox with a topical medication. (*Id.* at PageID.387, 395). The pustule healed within one "to two weeks" without ever "crack[ing] open," "bleed[ing]," requiring "bandag[es]" or causing any secondary symptoms beyond "irritat[ion]." (*Id.* at PageID.388, 395).

While housed in Franklin-B, Fox had a sink in his cell, "daily" access to a shower, and the ability to obtain soap upon request. (*Id.* at PageID.373, 381). Fox could also launder his clothes three times per week. (*Id.* at PageID.379). On certain days of the week, Fox could drop off his clothing for laundry services in the evening, and the following morning, his clothes would be returned, clean, to his room. (*Id.* at PageID.377–80). Yet Fox never used this overnight service to clean his socks. Because of a neurological injury to his left foot, Fox's left foot was "always cold," so he would sleep with a pair of socks on each night. (*Id.* at PageID.381–83; *see also* ECF No. 45, PageID.432). In fact, Fox testified that he wore his socks for the entire eighteen-day period, removing them only to shower. (*See* ECF No. 41-2, PageID.373, 381–82, 386). Fox does not explain why he did not launder his socks individually, washing one sock overnight while the other kept his left foot insulated.

Following his release from Franklin-B, Fox filed this action against Jenkins under 42 U.S.C. § 1983, alleging that Jenkins violated his rights under the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment, and various

internal policies promulgated by the MDOC.  (ECF No. 1).  His complaint also names "all Jane and John Does related . . . to [the] matter" as defendants, but it does not contain any allegations related to the "Doe" defendants.  (*Id.* at PageID.1, 3).

Jenkins moved for summary judgment in July 2022, arguing that Fox neglected to properly exhaust his administrative remedies before filing this action, as required by the Prison Litigation Reform Act ("PLRA").  (ECF No. 20). Specifically, she noted that MDOC officials rejected Fox's grievances on procedural grounds because he failed to file his initial grievance in a timely manner and his first administrative appeal did not include a copy of his initial grievance.  (*Id.* at PageID.88 (citing ECF No. 20-3)).  The Court ultimately denied summary judgment. (ECF No. 27).

About one month after recommending that the Court deny Jenkin's motion for summary judgment, I issued an order requiring Fox to identify the "John or Jane Doe Defendants" within the following month so the Court could issue summons and direct the United States Marshals Service to serve the unidentified defendants.  (ECF No. 26, PageID.186–87).  Fox responded to the order before the Undersigned's deadline, naming "R. Buhl," "O. Carter," and "A. Douglas" as the Doe defendants. (ECF No. 29, PageID.194).  Fox explained that each of these Defendants were responsible for denying his internal grievance against Jenkins, and that by failing to address his grievance on its merits, they deprived him of his ability to "access the

6

courts" and were "complicit[]" in Jenkin's Eighth Amendment Violation. (*Id.* at PageID.195–96).[2]

Indeed, Buhl, the Grievance Coordinator at Fox's prison, apparently refused to consider Fox's first grievance appeal because he failed to attach the initial grievance and directed Fox to resubmit his Step II grievance. (ECF No. 20-3, PageID.108). Douglas appears to have denied Fox's initial grievance on the grounds that it was not timely filed. (*Id.* at PageID.110). And unlike Buhl and Douglas, Carter does not appear to have been involved in Fox's grievance process. (*Id.*) When rejecting Fox's initial grievance, Douglas signed a form with Carter's name printed below the signature line. (*Id.*) This, Fox reasons, "implicate[s]" Carter and demonstrates that Carter "attempt[ed]" to "quash" his grievance on illegitimate grounds. (ECF No. 29, PageID.195).

For reasons that are not clear from his response, Fox believed that he could not name these defendants in his complaint until the Undersigned issued a Report and Recommendation finding that Fox's grievances were not procedurally defective.

---

[2]   MDOC Policy Directive 03.02.130 prescribes the three-step administrative exhaustion process for grievable matters. Mich. Dept. of Corrections, Policy Directive No. 03.02.130 (Mar. 18, 2019). At Step I, a prisoner must "attempt to resolve the issue with the staff member involved within two business days" and, if unsuccessful, must file a grievance within five business days. *Id.* at ¶ S, W. If the inmate is dissatisfied with the disposition of the grievance, or does not receive a response ten days after the due date, he or she may file a Step II grievance using the appropriate form. *Id.* at ¶ DD. Similarly, if the inmate is dissatisfied with the Step II response or does not receive a response for ten days after the response was due, he or she has ten days to file a Step III grievance. *Id.* at ¶ HH.

(*Id.* at PageID.197).  Even so, the Undersigned ordered the MDOC to email Buhl and Carter's "last known address[es]" to the Marshals for service of process.  (ECF No. 31, PageID.210).  But due to the Court's oversight, the order did not mention Douglas and the Court did not update its docket to recognize Douglas a defendant.  (*Id.*)

The Undersigned ordered the parties to complete discovery by May 12, 2023 and to submit any dispositive motions by June 16, 2023.  (ECF No. 28).  Although the Marshals asked Buhl and Carter to waive service on May 15, and Buhl and Carter waived service on May 31, Fox did not move the Court to extend the discovery deadline.  (ECF Nos. 36, 37).  Buhl, Carter, and Jenkins then moved the Court to enter summary judgment in their favor on June 16, and filed an "amended" motion for summary judgment (with no substantive changes to the original) a few days later.  (ECF Nos. 39, 41).

Over a month later, Fox filed a motion labeled as a "Motion for Response by Defendants to Discovery i.e. Interrogatories."  (ECF Nos. 28, 47).  In it, he moves the Court to order Buhl, Douglas, and Carter to respond to interrogatories he sent on the final day of discovery, and before any of the defendants had waived service.  (ECF No. 47, PageID.475; *see also* ECF No. 48-3).  Fox also requests leave to depose each defendant and Douglas.  (ECF No. 47, PageID.478).  Finally, the motion acknowledges the Court's failure to direct service on Douglas, but it does not

explicitly request any relief for this mistake.  (*Id.*)  Jenkins, Buhl, and Carter ask the Court to deny Fox's discovery motion as untimely.  (ECF No. 48).

## B.    Standards of Review

Although the Defendants style their motion as one for summary judgment under Rule 56, they ask the Court to dismiss Fox's claims against Buhl and Carter, not only because Fox fails to raise a genuine dispute of material fact, but because he has not stated a plausible claim for relief against either defendant in his complaint. Rule 56 is not the proper tool to challenge the sufficiency of a plaintiff's allegations. *McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 469, 478 n.2 (6th Cir. 2014); *Spadafore v. Gardner*, 330 F.3d 849, 852–53 (6th Cir. 2003).  Indeed, the purpose of summary judgment is to "pierce" the pleadings and assess whether the record contains factual disputes that must be presented to a jury.  *Bryant v. Kentucky*, 490 F.2d 1273, 1275 (6th Cir. 1974).

Thus, while contained in a single filing, the Defendants present the Court with two distinct motions.  As to Fox's claims against Jenkins, the Defendants move for summary judgment under Rule 56.  As to Fox's claims against Buhl and Carter, the Defendants move for dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and in the alternative, they move for summary judgment under Rule 56.  *See* 42 U.S.C. 21 1997e(g) (providing that Defendants in actions brought by prisoners need not reply to the complaint until ordered to do so by the court); Fed.

9

R. Civ. P. 12(b) (providing that parties must move for dismissal for failure to state a claim "before" filing a "responsive pleading"); *cf. Newman v. Mich. Dept. of Corr.*, No. 2:19-cv-11751, 2023 WL 3432182, at *3–4 (E.D. Mich. Feb. 17, 2023), *report & recommendation adopted by* 2023 WL 2731864 (E.D. Mich. Mar. 31, 2023).

### 1.    12(b)(6) Standard

A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).   Accordingly, a plaintiff's complaint shall be dismissed for failure to state a claim if it lacks sufficient "factual matter (taken as true) to" provide "plausible grounds to infer" that the elements of a claim for relief could be met.   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see* Fed. R. Civ. P. 12(b)(6).   A complaint must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.   Mere labels, conclusory statements, or "formulaic recitations" of the elements of a cause of action are not sufficient to meet this burden if they are unsupported by adequate factual allegations.   *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).   The requirement to provide a plausible claim does not require that a claim be "probable"; however, a claim must be more than merely "conceivable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009).

Because Fox filed his complaint *pro se*, his pleadings are liberally construed. *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

### 2.   Summary Judgment Standard

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that would affect "the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there . . . are any genuine factual issues that properly can be resolved only by a finder of fact . . . ." *Id.* at 249–50, 255. Accordingly, "the evidence, all facts, and any inferences that may be drawn from the facts" must be viewed "in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004). The nonmoving party cannot rebut a Rule 56 motion by merely alleging that a genuine factual dispute exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986) (quoting Fed. R. Civ. P. 56(e)). Instead, the nonmoving party must show that there is sufficient evidence in the record for "a reasonable finder of fact [to] find in its favor." *Anderson*, 477 U.S. at 248.

### C.   Analysis

11

### 1.      Buhl, Carter, and Douglas

Fox does not clearly articulate his claims against Buhl and Carter.  Rather than explain how either Defendant violated his federal rights, Fox simply attaches an assortment of documents from his grievance process to his complaint and leaves the Court to speculate as to what his claims might be.  (*See* ECF No. 1).

These documents are effectively part of the complaint, and some of them do mention Buhl and Carter.  (*Id.* at PageID.16–28); *see Nolan v. Detroit Edison Co.*, 991 F.3d 697, 707–08 (6th Cir. 2021).  And to be sure, Fox's failure to explicitly lay out his theory for relief—although perhaps not a wise decision—is not necessarily fatal: his claims are circumscribed by the facts he alleges, not the legal theories he presents. *Johnson v. City of Shelby*, 574 U.S. 10 (2014); *Skinner v. Switzer*, 562 U.S. 521, 530 (2011); 5 Charles Alan Wright, et al., Federal Practice and Procedure § 1219 & nn.7–8 (4th ed. 2023).  But even when liberally construed, these attachments do not contain any facts from which the Court might glean a plausible claim for relief.

As to Buhl, Fox attaches a letter he mailed to the MDOC's Office of Legal Affairs in October 2021, outlining his grievance process.  (ECF No. 1, PageID.16–18).  Although difficult to follow, the letter indicates that while Fox appealed his grievance through the MDOC's entire three-step process, he only received responses from the MDOC at steps one and three.  (*Id.*)  Fox appears to believe that he could

12

not file an action in federal court without a response at each step, and he accuses Buhl of refusing to respond to his step two grievance in an attempt to "time bar" him from filing an action in federal court.[3] (ECF No. 1, PageID.16–18; *see also id.* at PageID.24, 26–28).

In essence, Fox alleges that Buhl's failure to respond to his Step II appeal prevented him from accessing the courts. (*See* ECF No. 1, PageID.17–18; *see also* ECF No. 29, PageID.195). But for a few reasons, Fox fails to state a plausible access to the courts claim. First, Fox is mistaken that he needed to have a Step II response before he could file his complaint. (ECF No. 1, PageID.18). The PLRA only requires him to "exhaust" his "administrative remedies" before filing a complaint, and under the MDOC's grievance procedure, he could have appealed to Step III if he did not receive a response within twenty-five days "after receipt of the" Step II appeal. 42 U.S.C. § 1997e(a) (2018); *see* Policy Directive No. 03.02.130, *supra*, at ¶¶ KK, NN. Thus, Fox had exhausted his administrative remedies once his Step III

---

[3] Fox's letter claims that after he filed a Step II grievance, he received a Step III response "upholding the Step II denial." (ECF No. 1, PageID.17–18). In his deposition, Fox clarifies that he appealed to Step III before he received a Step II response, and that while his Step II appeal was pending, Buhl informed Fox that he would not process his Step II appeal because Fox did not attach his initial grievance to his appeal form. (ECF No. 41-2, PageID.363–64; *see also* ECF No. 20-3, PageID.106–08). For reasons that are not clear, the MDOC's step three response seems to treat Buhl's request for Fox resubmit his Step II appeal as a rejection. (ECF No. 20-3, PageID.106). The record does not contain any evidence that Fox resubmitted his Step II appeal, nor does it indicate that the MDOC responded to his initial Step II appeal.

appeal was rejected, and if he had waited the entire twenty-five day period before appealing, then he would have exhausted his remedies "properly."[4]   Second, even if Fox could not file this action without receiving a response, the statute of limitations for his claims would be tolled while he awaited a response from the MDOC.  *Surles v. Andison, et al.*, 678 F.3d 452, 458 (6th Cir. 2012); *Brown v. Morgan*, 209 F.3d 595, 596 (6th Cir. 2000).   And third, Fox need only exhaust his "available" administrative remedies.   42 U.S.C. § 1997e(a).   Even if he required a Step II response to either appeal to Step III or file his complaint, an untimely response to his Step II appeal would have rendered his administrative remedies unavailable at Step II.  *Russ v. TDOC*, No. 19-5656, 2020 WL 3317753, at *2 (6th Cir. Jan. 15, 2020); *Boyd v. Corr. Corp. of America*, 380 F.3d 989, 996 (6th Cir. 2004); *see Ross v. Blake*, 578 U.S. 632, 643 (2016).

Fox's claims against Carter stand on even shakier grounds.   The only document attached to the complaint mentioning Carter is the MDOC's denial of his initial grievance.  (ECF No. 1, PageID.22).   Although Carter's name appears below the signature line, in print, the form is signed "A. Douglas for [Carter]."  (*Id.*)  Even if the Court can infer from this document alone that Fox's Step I grievance was

---

[4] Perhaps because the MDOC's grievance record appears to indicate that Fox appealed Buhl's refusal to process his Step II grievance, Jenkins did not move for summary judgment on the basis that Fox prematurely appealed to Step III.  (*See* ECF No. 20, PageID.88–89 (characterizing Buhl's request for Fox to refile his Step II grievance as a "rejection" that was "affirmed" at Step III); ECF No. 20-3, PageID.106, 108).

improperly denied, it still does not contain enough information to state a plausible claim for relief against Carter.

To start, Fox does not plausibly allege that Carter was personally involved in his grievance process. Section 1983 requires an affirmative link between the plaintiff's injury and the conduct of that defendant. *Rizzo v. Goode*, 423 U.S. 362, 371–72 (1976). To demonstrate an affirmative link, a plaintiff must make a clear showing that a defendant's conduct was the proximate cause of his injury. *Id.* at 375; *Powers v. Hamilton Cty. Pub. Def.*, 501 F.3d 592, 608 (6th Cir. 2007); *Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995). And for that reason, government officials cannot be held vicariously liable under § 1983 based solely on their roles as supervisors. *Shehee v. Lutrell*, 199 F.3d 295, 300 (6th Cir. 1999). Simply alleging that Douglas signed the grievance response "for" Carter does not show that Carter was involved in the decision to reject his grievance.

And even if the Court could plausibly infer Carter's involvement, it is not unlawful for officials to deny meritorious grievances; Fox's remedy for an ineffective grievance process is simply to pursue his claims in court. *Grinter v. Knight*, 532 F. 3d 567, 576 (6th Cir. 2008); *Walker v. Mich. Dept. of Corr.*, 128 F. App'x 441, 445–46 (6th Cir. 2005); *Simpson v. Overton*, 79 F. App'x 117, 120 (6th Cir. 2003) ([T]he denial of an appeal cannot in itself constitute sufficient personal involvement to state a claim for a constitutional violation."). Further, denying Fox's

15

grievance on spurious procedural grounds did not hinder his ability to access the courts. *See Walker*, 128 F. App'x at 446. Although Fox is required to "properly" exhaust his administrative remedies, improper exhaustion is an affirmative defense that defendants must raise and prove. *Jones v. Bock*, 549 U.S. 199, 211, 216 (2007). Thus, Fox may rebut the state's contention that he did not properly exhaust his administrative remedies—and he has already done so successfully.[5]

Not only should the Court dismiss Fox's access to the courts claims against Buhl and Carter, but it should do so with prejudice, forbidding Fox from amending his complaint to either clarify the scope of these claims or add Douglas as a defendant. Fox's deposition testimony and his filings confirm that his claims against Buhl and Carter concern their involvement in the grievance process, and for the reasons stated above, any amendment to elaborate these claims would be futile. *See Newberry v. Silverman*, 789 F.3d 636, 646 (6th Cir. 2015) (holding that dismissal with prejudice is proper where a complaint cannot be saved by amendment); (ECF No. 29, PageID.195; ECF No. 41-2, PageID.364; ECF No. 45, PageID.427, 431).

---

[5] In some of Fox's filings, he suggests that his claim against Buhl centers not on Buhl's failure to respond at Step II, but on his role in "deem[ing]" the Step I grievance to be "untimely" and delivering it to Douglas or Carter for a Response. (*See, e.g.*, ECF No. 45, PageID.427, 431). Setting aside the fact that neither Fox's complaint nor the record suggests that Buhl influenced the decision to reject his Step I grievance, simply delivering Fox's grievance to the MDOC's respondent does not show that Fox was personally involved in its rejection. *See Shehee v. Lutrell*, 199 F.3d 295, 300. And even if it did, such a claim would fail for the same reasons that Fox does not state a plausible claim for relief against Carter.

As for Douglas, I note that because the Undersigned did not direct the Marshals Service to serve Douglas after Fox responded to the Court's order directing him to name the Doe defendants, Douglas is not currently a defendant in this matter. Amending the operative complaint under Federal Rule of Civil Procedure 15 is the proper method for naming a Doe defendant. *See Petty v. County of Franklin, Ohio*, 478 F.3d 341, 346 n.2 (6th Cir. 2007); Fed. R. Civ. P. 15(c)(1)(C). Because Fox could not amend his complaint as a matter of course at the time he sought to add Douglas, he could not add Douglas without the Court's leave. *See* Fed. R. Civ. P. 15(a). But because the order directing service did not acknowledge Douglas, Fox did not have leave to add Douglas to the complaint. (ECF No. 31). Still, I recommend that the Court not grant Fox leave to name Douglas as a defendant. For many of the same reasons that Fox does not state a plausible claim for relief against Carter, any claim against Douglas would be futile.

To summarize, I recommend that the Court dismiss Fox's claims against Buhl and Carter with prejudice for failure to state a plausible claim for relief, and I recommend that the Court not allow Fox leave to add Douglas as a defendant.

### 2.   Amie Jenkins

The scope of Fox's claims against Jenkins are far from clear. As with Buhl and Carter, Fox does not provide the Court a straightforward summary of his claims. Once again, he asks the Court to comb through a patchwork of documents from his

grievance process for facts that might support a cause of action—a strategy that has created some confusion.  Indeed, Jenkins reads the complaint to allege violations of the Eighth and Fourteenth Amendments, and she interprets Fox's Eighth Amendment claim to challenge her failure to treat his fungal infection.  (ECF No. 41, PageID.399–43, 345–46).

That is not quite correct.  Although Fox mentions that he developed a fungal infection following his quarantine, the thrust of his claim is not that he was denied inadequate medical care, it is that he was denied clean clothing for an extended period.  (*See* ECF No. 1, PageID.20–21; *see also* ECF No. 41-2, PageID.395, 399–400).  In other words, the infection is the result of the deprivation; it is neither the deprivation itself nor the impetus for a deprivation of adequate healthcare.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (recognizing that all conditions of a prisoner's confinement are subject to scrutiny under the Eighth Amendment, not just an inmate's access to healthcare).  Indeed, Jenkins was not involved in the treatment of his infection, and Fox did not even notice the infection until he returned to Auburn-A.  (ECF No. 41-2, PageID.386).  Further, while Jenkins is correct that Fox alleges Eighth and Fourteenth Amendment violations, she glosses over the fact that Fox also alleges violations of state law, asserting an independent claim for violations of various internal MDOC policies.  (ECF No. 1, PageID.8).

With the scope of Fox's claims deciphered, the Court can turn to their merits. To start, I suggest that Fox fails to raise a genuine dispute as to whether Jenkins violated his right to due process. To the extent Fox alleges a procedural due process violation, the record contains no evidence that Jenkins deprived him of an adequate procedure to challenge the MDOC's failure to supply clean clothing. *See generally Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) (outlining the elements of a procedural due process claim). And to the extent Fox intends to bring a substantive due process claim, I suggest that he still fails to raise a genuine dispute of material fact because his injury implicates the Eighth Amendment and "the rubric of substantive due process" cannot be used to analyze a claim "covered by a specific constitutional provision." *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)).

In addition, I suggest that Fox's claims alleging violations of the MDOC's internal policies fail because those policies "do not have the force of law and no sanction attaches to [their] violation." *Hunt v. Brault*, No. 19-11994, 2021 WL 1923418, at *4 (E.D. Mich. May 13, 2021) (internal quotation marks omitted) (quoting *Jordan v. Dep't of Corr.*, No. 289667, 2010 WL 935686, at *2 (Mich. Ct. App. Mar. 16, 2010)).

Fox's Eighth Amendment claim presents a closer question. The Eighth Amendment prohibits "cruel and unusual punishment." U.S. Const. amend. VIII.

This protection applies not only to the terms of a convicted defendants' sentence, but also to the "conditions under which" a prisoner "is confined." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). To establish an Eighth Amendment violation, a prisoner must first show that he or she has been denied a "necessity of civilized human existence." *Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004). That is, the deprivation at issue must be "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 835 (internal quotation marks omitted) (quoting *Wilson v. Seiter*, 452 U.S. 294, 298 (1991). If the prisoner can make this threshold showing, he or she must then prove that the official was "deliberate[ly] indifferen[t]" to that need, meaning that the official knew of and disregarded the prisoner's need "by failing to take reasonable measures to" correct it. *Farmer*, 511 U.S. at 828–29, 847; *see also Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004).

Fox strikes out on the first element of his claim. A sufficiently serious need is one that deprives an inmate of a "necessity of civilized human existence." What constitutes a "necessity of civilized human existence" is determined by "contemporary standards of human decency" rather than a court's own "notions of enlightened policy." *Hadix*, 367 F.3d at 525 (internal quotation marks omitted) (quoting *Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir. 1990)). By their nature, prisons are "[h]arsh and uncomfortable," so only "'extreme deprivations'" that deprive inmates of the "'the minimal civilized measure of life's necessities'" violate

20

the Eighth Amendment.  *Id.* (first quoting *Hudson v. McMillan*, 503 U.S. 1, 9 (1992); and then quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  These "minimal necessities" encompass basic human needs such as adequate medical care, food, shelter, and safety.  *Farmer*, 511 U.S. at 832.

Clean clothing, to be sure, is a basic human need.  *See id.* at 832 (recognizing "clothing" as a basic need).  But to say that prison officials have interfered with an inmate's access to clean clothing is just to begin: to implicate the Eighth Amendment, a denial of clean clothing must cause more than mere discomfort. Although the odors and discoloration associated with soiled clothing may be unpleasant, transitory exposure to these conditions is an inconvenience, not a denial of life's necessities.  *See Pena v. Brown*, No. 2:20-cv-250, 2021 WL 4350124, at *5, *7 (W.D. Mich. Sept. 23, 2021); *Wiley v. Kentucky Dept. of Corr.*, No. 11-97-HRW, 2012 WL 5878678, at *4 (E.D. Ky. Nov. 21, 2012).  Absent evidence of prolonged exposure to soiled clothing, or evidence that the denial of clean clothing created an "intolerable risk" of "disease," a deprivation of clean clothing is not sufficiently serious to raise constitutional concerns.  *Myers v. Indiana Dept. of Corr.*, 655 F. App'x 500, 504 (7th Cir. 2016); *Brown v. Timmerman-Cooper*, No. 2:10-cv-283, 2013 WL 430262, at *2 (S.D. Ohio Feb. 4, 2013), *report & recommendation adopted by* 2013 WL 1344857 (S.D. Ohio Apr. 2, 2013).

Thus, courts have held that no constitutional violations where prisoners have worn the same, unwashed clothing for up to thirty days. *E.g.*, *Stallworth v. Wilkins*, 802 F. App'x 435, 444 (11th Cir. 2020); *Wiley*, 2012 WL 5878678, at *4 (holding that a fourteen-day deprivation of clean clothing was lawful); *McCorkle v. Walker*, 871 F. Supp. 555, 557 (N.D.N.Y. 1995) (holding that a fifteen-day deprivation of clean clothing was lawful). And courts have licensed even longer deprivations where prisoners could wash their clothing through unconventional means—say by washing their clothing in a sink with soap. *Dossett v. Neal*, No. 3:22-CV-104, 2023 WL 34626, at *2 (N.D. Ind. Jan. 3, 2023) (finding no Eighth Amendment violation where a prisoner was forced to wear the same underwear, socks, and shirt for "five months" because the prisoner had access to a "sink" and a "bar of soap").

Even construing the facts in the light most favorable to Fox, he cannot raise a genuine dispute as to whether his need for clean clothing was sufficiently serious to violate the Eighth Amendment. Fox first argues that being forced to wear the same shirt, shorts, and underwear for the first five days of his quarantine was cruel and unusual. (ECF No. 45, PageID.431–32). But this five-day deprivation—during which Fox had "daily" access to a shower—is too short-lived to raise constitutional concerns. (ECF No. 41-2, PageID.373, 381); *see Pena*, 2021 WL 4350124, at *5.

Fox's eighteen-day deprivation of clean socks presents a closer question. But again, Fox fails to raise a genuine dispute of material fact. Indeed, an eighteen-day

22

deprivation of clean clothing falls comfortably within the range of deprivations other courts have found to be too brief to violate the Eighth Amendment. *Cf. Stallworth*, 802 F. App'x at 444. And apart from the brevity of Fox's deprivation, he fails to genuinely dispute several other mitigating factors which cut against its severity.

First, Fox could have washed his socks while quarantined. Although Fox admits to having access to a sink and soap in his room, he need not have resorted to these measures because he was offered laundry services three times per week. (ECF No. 41-2, PageID.373, 377–81). For his part, Fox argues that he could not remove his socks to have them laundered because of a medical condition that causes his left foot to always feel "cold." (ECF No. 45, PageID.432). Thus, he had to constantly wear socks to keep his left foot warm. (*Id.*; *see also* ECF No. 41-2, PageID.381– 83). But Fox does not explain why he could not have washed one sock at a time, sleeping with one sock over his left foot while the other would be laundered. (ECF No. 45, PageID.432).

Second, even if Fox had no means to wash his socks, he could have avoided the issue altogether by choosing not to wear socks during his eighteen-day quarantine. (ECF No. 41-2, PageID.381–82). Unlike other articles of clothing, say, shirts or pants—socks are typically not indispensable. Fox had a pair of shoes, and because he was quarantined during September, he would not have needed socks to protect him from the elements if he were permitted to go outdoors during his

quarantine.  (*Id.* at PageID.367).  Although Fox maintains that he required socks to keep his feet warm due to his medical condition, he presents no evidence demonstrating that his "cold" left foot would have been nothing more than a minor discomfort he could have endured for his brief quarantine.  (ECF No. 45).

Third, setting all that aside and assuming that Fox had to wear a soiled pair of socks for the entire eighteen-day quarantine, he presents no evidence that this posed a serious health risk.  In fact, the only medical consequence of wearing his unwashed socks for the entire period was a minor, "thumbnail" sized "pustule" that cleared within weeks without ever splitting open.  (ECF No. 41-2, PageID.373, 381–82, 386–88, 395); *Cf. Wright v. J & S Extradition Servs., LLC.*, No. 3:11-0464, 2012 WL 1681812, at *8 (M.D. Tenn. May 11, 2012) (holding that "white blisterish pockets" that formed on the bottoms of a prisoner's feet after he was "not allowed to change his socks" were not sufficiently serious injuries).

And fourth, whatever risk Fox did face, he could have mitigated by washing his feet.  Again, Fox had daily access to a shower, and he had a sink with soap in his room.  (ECF No. 41-2, PageID.373, 381); *see Pena*, 2021 WL 4350124, at *5.

At bottom, Fox has not raised a genuine dispute as to whether he maintained an injury serious enough to implicate the Eighth Amendment.  Thus, I recommend that the Court grant summary judgment in favor of Jenkins.

### 3.    Fox's Discovery Motion

Last, I recommend that the Court deny Fox's motion to compel discovery as untimely. Indeed, Fox filed his motion over two months after the close of discovery without asking the Court to extend its deadline. (ECF Nos. 28, 47). Further, the motion would be moot to the extent it seeks discovery from Buhl, Carter, and Douglas should the court adopt this report and recommendation.

### D. Conclusion

For these reasons, **I RECOMMEND** that this Court **GRANT** Defendants Jenkins, Buhl, and Carter's motions for summary judgement (ECF Nos. 39, 41) and dismiss Fox's complaint **WITH PREJUDICE**. I also **RECOMMEND** that the Court **DENY** Fox's discovery motion (ECF No. 47).

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise

others, will not preserve all the objections a party may have to this R&R.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 20, 2023                          s/PATRICIA T. MORRIS
                                                 Patricia T. Morris
                                                 United States Magistrate Judge